UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| TIMOTHY R. COOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:18-cv-384-PPS |
| | ) | |
| ARCELORMITTAL USA LLC, and | ) | |
| ARCELORMITTAL BURNS HARBOR | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Plaintiff Timothy Cook sued his former employer, ArcelorMittal USA LLC, and

ArcelorMittal Burns Harbor LLC,[1] for age discrimination after he was fired from his

engineering job with the company. ArcelorMittal now seeks summary judgment

contending that the undisputed facts show that there was a legitimate reason to

terminate Cook's employment that had no connection to his age whatsoever.

ArcelorMittal says that Cook failed on multiple occasions to learn a necessary computer

program and after multiple opportunities (and failures) to improve, it let him go. Cook

disagrees and says there are questions of fact about the company's reasons for firing

him which can only be decided by a jury. A review of the undisputed facts, evidence

---

[1] There is some dispute as to which entity was Cook's actual employer. Defendants say it was only the "Burns Harbor" entity, not the "USA" entity. [DE 28 at 1, n.1.] At present, however, both remain defendants in the case and I'll refer to them collectively as simply ArcelorMittal as it mostly seems to be a distinction without a meaningful difference for our purposes.

submitted, and governing law show that ArcelorMittal is correct. No reasonable jury could find that age was the but-for cause of Cook's termination and summary judgment must be granted in ArcelorMittal's favor.

## Background

Tim Cook, who is currently 67 years old, was hired by ArcelorMittal as a process automation engineer in 2008, when he was 55 years old. [DE 29-2, T. Cook Dep. Tr. 17:20-21, 19:1-20:23, 34:8-10.] ArcelorMittal is the world's largest steel producer and has a major presence in Northwest Indiana. Cook has worked in the steel industry his entire adult life. He began in 1972, after he left Valparaiso University without completing a degree, but he later obtained a bachelor's degree in computer science from Valparaiso University. Then he got a master's degree in computer science from DePaul University. [*Id.* at 20:20-21:18.] He continued working in the steel industry, but in a different capacity, as a computer engineer. Prior to ArcelorMittal, Cook's employers included U.S. Steel, National Steel, EDS, Bethlehem Steel, and Mittal Steel, many of which were precursors in some form or another to the entity that is now ArcelorMittal. [*Id.* at 21:19-25:3.]

For most his tenure at ArcelorMittal, Cook worked primarily on something called the "Genesis Project." That is a specific project within the larger "finishing department" at the company—which is the final stage of steel production within the plant. [*See* DE 29-3, T. Levendoski Dep. Tr. 15:17-16:25.] The name is an acronym, standing for "Generic Stockyard Inventory System" and is a software system which

helps the company efficiently track and move products throughout its various departments [*Id.* at 25:14-26:21.] Cook was part of a team of computer engineers who assisted those working on the actual manufacture of various steel products.

As part of his job, Cook was expected to stay abreast of technological advancements in industrial controls. [Cook Dep Tr. 60:19-21.] At some point around 2012, Cook was promoted to senior process engineer. [*Id.* at 53:24-54:13.] But he continued to have roughly the same job requirements and was responsible for doing his own computer programming. [*Id.* at 54:14-56:5.] One of those technological advancements was the use of a software language or protocol known as C#— a computer programming language developed around 2000 by Microsoft and pronounced "C sharp." *See generally*, Wikipedia, *C Sharp (programming language)*, https://en.wikipedia.org/wiki/C_Sharp_(programming_language) (accessed July 27, 2020).

Cook readily admitted at his deposition that throughout his tenure at ArcelorMittal, he was not well-versed or capable in using C#. [Cook Dep. Tr. 73:9-24.] He sought out and attended some trainings on learning C# at various points in time, but says he had a Goldilocks-type problem. Cook testified that the courses were all either too elementary for him or too advanced for him, and he was unable to significantly improve or expand his C# abilities as a result. [*Id.* at 74:6-20, 113:19-25.] The practical implication of this was that when he could not program something using C# (usually a website) because it was either beyond his capabilities or would take him

-3-

an inordinate amount of time to do so, he had another engineer simply do it for him.

Up through at least 2015, Cook received somewhat middling—but satisfactory—performance reviews. He was rated a "3" on his annual performance reviews on the five-point scale (1 being the lowest 5 being the highest) used by ArcelorMittal. Under that system a "3" means an individual was meeting expectations—not exceeding them but meeting them. Things changed at some point in the 2015-2016 timeframe. Cook's manager testified that, starting around that timeframe, it became "very noticeable" that Cook was not performing his job satisfactorily and that it became "a pattern over time and it appeared that everything we'd tried to do was not getting the results we wanted." [Levendoski Dep. Tr. 36:18-37:6, 38:21-39:10.] Other members of the Genesis Project team began to voice concerns with their superiors about having to do Cook's work for him when it came to software and programming. [*Id.* at 52:20-53:17.]

This concern played out in Cook's annual performance review which occurred in early 2016 (reviewing his performance for 2015 and setting goals for 2016). Cook met with his manager for his review and he came away from the meeting understanding that ArcelorMittal was concerned about his performance. At his deposition, Cook admitted that he "inferred from the things [his manager] said" that he was not meeting their expectations. [Cook. Dep. Tr. 79:7-25.] And indeed, when the annual review was committed to writing, his inference proved correct: Cook received a rating of a "2" on his 2016 performance review, indicating that he only "somewhat" met expectations, a rating below what he had previously received. [*Id.*] Cook admitted that he performed

-4-

his job responsibilities relating to "computer programming, coding, and software development" only "[s]omewhat, not extensively" and he admitted that this was because he "had limitations in [his] knowledge of C#." [*Id.* at 73:9-15.] Thus, from the 2016 performance review onward, Cook understood that his manager wanted him to get additional training in software coding and programming because Cook was not meeting expectations with his software programming abilities. [*Id.* at 80:2-26.] That meant C#. [*Id.*] But it seems very little changed regarding that over the course of 2016. [*Id.* at 144:14-146:10.]

In June 2017, around the time of his midyear review, Cook testified that his manager Tom Levendoski asked him "what his plans were." [Cook Dep. Tr. 151:21-152:12.] At his deposition, Cook testified he could not remember the exact words, but he interpreted the question as asking about him about his plans for retirement, even if Levendoski did not specifically use the word "retirement." [*Id.*] Cook replied that he had no plans to retire and the conversation did not continue from there it seems. [*Id.* at 153:3-23.] Cook testified this was the only instance where any manager or similar individual at ArcelorMittal discussed retirement with him. [*Id.* at 153:17-154:12.] Of course, I must credit Cook's version of the conversation at this point, but Cook's manager denies this conversation ever happened. [Levendoski Dep. Tr. 60:12-14.]

Three months later, despite the statements in performance reviews that Cook needed to improve his programming knowledge, ArcelorMittal says that Cook's performance did not sufficiently improve. Thus, on September 7, 2017, a Performance

Improvement Plan ("PIP") was instituted for him by his manager and ArcelorMittal

Human Resources. Cook sat down and discussed the PIP with his manager and

representatives from HR. While Cook disclaimed any specific memories of what all was

said at the meeting, he signed the physical document memorializing the PIP and agreed

that he understood improvements in his performance were required "during the stated

period" which was through December 31, 2017. [Cook Dep. Tr. 86:14-87:7.]

The PIP included three specific deficiencies in performance that Cook was to

address. It stated:

1. Tim is not doing the programming and software development to carry his
   portion of the [Process Automation] workload.
2. Tim needs to demonstrate commitment to operations and achieve their goals.
3. Tim needs to be involved or engaged with the day to day support to
   operations and demonstrate ownership in the operating processes and
   equipment.

[Cook. Dep. Tr. at Ex. 12.] After the September 7 meeting, Cook's primary

understanding was that he "needed to up [his] game as far as [his] C# knowledge," in

order to correct the first deficiency noted in the PIP. [Cook Dep. Tr. 95:11-15.] Cook

testified that he understood it would be "the end of [his] job" if he did not satisfy all of

the performance improvement "bullets" in his PIP. [*Id.* at 128:12-129:8.]

In response to the expectations put upon him by the PIP, Cook testified that none

of his managers offered any formal training to him on how to get training on C# after

the September meeting. [Cook Dep. Tr. 99:6-17.] But he testified that had he found an

-6-

appropriate class to take, he thought the company would have paid for or reimbursed him for it. [*Id.* at 150:24-151:6.] That just never happened because he still thought the classes were either too elementary or too advanced for him. [*Id.* at 74:6-20, 113:19-25.] Concerning the learning he completed on the subject, Cook testified that he purchased a book on his own, but he didn't "complete the whole book." [*Id.* at 107:12-108:5.] He also watched about a dozen free online training videos on C# offered by "Microsoft Virtual Academy," but he did not receive any sort of certificate of completion to document that. [*Id.* at 82:13-84:25.] At his deposition, he could not recall if he informed his managers that he had read portions of the C# book or taken the Microsoft trainings to demonstrate his attempts to gain knowledge in C#. [*Id.* at 109:14-22.] Cook further sought assistance of coworkers, and his coworkers were specifically instructed by their manager "not to do that work for [Cook]" as they had done previously, "but to assist [him] in it." [*Id.* at 110:18-111:18.] Finally, Cook testified that he sought out assistance learning C# via Skype and telephone from a freelance instructor named James Buff through a service called "Upwork." Cook said he paid cash for the lessons, did not have any records of them, and he did not tell anyone at ArcelorMittal that he got help learning C# via this service. [*Id.* at 114:1-115:24.]

While Cook felt his efforts improved his C# skills, he admitted that he was still not proficient in the software by the end of 2017. [*Id.* at 132:14-20.] This much was evident when, at the end of the PIP, Cook was unable to complete an assigned task of creating a webpage on his own and had to rely on a co-worker to do it. [*Id.* at 133:1-14,

134:4-11; *see also* Levendoski Dep. Tr. 61:18-63:1.]

On January 19, 2018, Cook's employment with ArcelorMittal was terminated. [Cook Dep. Tr. 134:21-136:15.] His "termination script" stated that his "termination comes as a result of being unable to sufficiently satisfy [his] Performance Improvement Plan." [*Id.*; *id.* at Ex. 20.] Cook does not contest this fact and he admitted at his deposition that he did not satisfy the requirements of his PIP. [*Id.* at 136:16-23.] Specifically, he testified that in his opinion he completed two of the three items, but only "probably a quarter of the first item" which related to improving his proficiency in C#. [*Id.*] His manager's opinion was that he completed none of the objectives. [Levendowski Dep. Tr. 58:2-20.]

After his termination, Cook filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). As part of that administrative process, Cook met with an investigator from the EEOC and gave her an interview about his discrimination claims. Cook testified that he told the investigator that if a "programming issue" came up on the job, "[i]f it was something that I wasn't equipped to do or if it was something that needed to be done in a much more timely fashion" he would not do the work himself and instead "farmed out the work" to younger colleagues who were more adept at C#. [Cook Dep. 140:14-141:16.] Nonetheless, he felt that his termination was related to his age and the fact he told his manager that he was not planning on retiring anytime soon. He then timely filed this lawsuit in federal court, alleging one count of age discrimination relating to the manner and circumstances of his

employment termination.

## Discussion

Summary judgment should be granted when "there is no genuine dispute as to any material fact and [the moving party is] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It's often called the "put up or shut up moment" in a lawsuit. *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (citation omitted). The moving party bears the initial burden of showing there are no genuine issues of material fact at issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The nonmoving party then must dispute those supposedly undisputed facts by putting forth evidence which contradicts them or creates an open question of fact. In deciding whether factual questions remain, I must draw all reasonable inferences in favor of the nonmoving party, so long as their arguments are supported with evidence and not "only speculation or conjecture." *Agryropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008). That means that if ArcelorMittal meets its initial burden, it falls to Cook to point me to contradictory evidence which creates a material question of fact. *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) ("To survive a motion for summary judgment, she must present the court with evidence that, if believed by a trier of fact, would establish each of the elements of her claim."). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986).

In the employment discrimination context, there are additional specific considerations and legal standards at play. As noted above, Cook has alleged only one count in his complaint and so that is all ArcelorMittal has moved on. That is an age discrimination claim under the Age Discrimination in Employment Act ("ADEA"). *See* 29 U.S.C. §§ 621-634. That statute says that it is "unlawful for an employer … to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). Cook asserts a disparate treatment claim under the ADEA, arguing, in summary, that he was treated unequally compared to his similarly situated, but younger, colleagues.

In order to succeed on this claim (and survive summary judgment) Cook has the burden to point to evidence that age was the "but-for" cause for his termination. *Gross v. FVL Fin Servs, Inc.*, 557 U.S. 167, 177 (2009) ("[U]nder § 623(a)(1), the plaintiff retains the burden of persuasion to establish that age was the "but-for" cause of the employer's adverse action[.]"). In order to meet this causation requirement and survive summary judgment, plaintiffs may employ the "burden shifting framework" methodology developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "Under this method, a plaintiff has the burden of establishing a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he met the employer's legitimate business expectations; (3) he suffered an adverse employment

-10-

action; and (4) similarly situated employees outside of the protected class were treated more favorably." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 463 (7th Cir. 2014). If Cook satisfies that burden and establishes those four things, the burden then shifts to ArcelorMittal to put forth a legitimate nondiscriminatory basis for its decision to fire him. If that happens, Cook can still prevail at summary judgment if he puts forth evidence which suggests that the stated reason was merely pretextual. *Id.*

Before diving into the evidence, it is important to keep in mind what exactly the task at hand is. I am attempting to decipher whether age was the "but-for" cause of Cook's termination. In evaluating the evidence, I cannot, as courts in this circuit used to, divide evidence into piles of "indirect" or "direct" evidence of discrimination and evaluate them differently. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765-6 (7th Cir. 2016). Evidence is evidence. In other words, "all evidence belongs in a single pile and must be evaluated as a whole." *Id.* at 766. And there is nothing in the record of this case to suggest that had Cook been less than 40, and all other things had been the same, he would have been treated any differently. That point is borne out in the analysis of the *McDonnell-Douglas* methodology which I will proceed to next.

There is no dispute that Cook was a member of a protected class on account of his age and he obviously suffered an adverse employment action. But ArcelorMittal says that Cook did not meet the company's legitimate business expectations and Cook has failed to point to similarly situated employees outside of the protected class who were treated more favorably. Cook contests these two points and says questions of fact

-11-

exist on both issues. I disagree.

I'll begin with whether Cook met ArcelorMittal's reasonable business expectations in his job as an automation process engineer. No one is saying Cook completely failed at his job. Far from it. For most of his tenure, his reviews reflected that he was performing his job adequately, at least as far as his managers knew. At issue are Cook's specific abilities as a programmer and his lack of proficiency in a computer programming language known as C#. Everyone seems to agree that C# was critical to the operations at ArcelorMittal's manufacturing facilities. And one of Cook's responsibilities was proficiency with the program. The problem is that the undisputed facts are that he was deficient in the program. And he admits it. He was specifically made aware of that fact no later than his performance review in early 2016 (2 years prior to his termination) in which he received a "2" rating, indicating that he only "somewhat" met his employer's expectations. [Cook Dep. Tr. at Ex. 10.] Cook testified at his deposition that, at that time in 2016, he "had limitations in [his] knowledge of C#" and when he could not do an assignment which required C# knowledge, "someone else would take care of that." [*Id.* at 73:9-24.].

Cook further acknowledged that at some point in either 2016 or 2017, his manager Tom Levendoski specifically told him on at least one other occasion that he needed to start doing his own computer programming and stop delegating it to others. [Cook Dep. Tr. 75:8-22.] ArcelorMittal says when over the course of the next roughly 18 months Cook did not improve his performance, he was put on a PIP and given

approximately 3 months to improve. When he failed to achieve the objectives laid out in the PIP, including learning C# (which he admits he did not achieve), he was fired.

Cook asks that I infer that the PIP was not because of his lack of proficiency in C#, but instead that it came about only after a June 2017 conversation with his manager in which he said he had no intention of voluntarily retiring. [*See* DE 34 at 4.] He further says that he was performing satisfactorily because he focused on other aspects of his job besides programming and left the programming to other engineers who worked on Project Genesis. [*Id.* at 5.] These arguments are unavailing because in the end Cook does not dispute that programming was a key component of his job and after multiple years of being told he needed to improve he was unable to become proficient in C#.

Nor is there a causal connection between the so-called "retirement" conversation and Cook's termination. For starters, all that his manager asked was "what his plans were." The statement is ambiguous; one might reasonably infer that such a question is a proxy for asking when someone was planning to retire. But that is far from certain. In either event, even if I assume that the question was getting at Cook's retirement plans, the conversation occurred in June 2017. He wasn't fired until six months later. There is nothing in the record that any other comments or questions on the subject were made to Cook either before or after that incident. And Cook does not say that Levendoski or anyone else at ArcelorMittal tried to pressure him into retiring beyond this one seemingly isolated comment.

But taking Cook at his word, that still isn't enough. The fundamental problem

with Cook's argument is that retirement is not a forbidden word in the employment context, nor is it a "third rail" that an employer must avoid in all circumstances. "[A] company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct." *Colosi v. Electri-Flex Co.*, 965 F.3d 500, 502 (7th Cir. 1992). Of course, while repeated and pointed questions about retirement could be "so unnecessary and excessive—that is, unreasonable—as to constitute evidence of discriminatory harassment", they are not *per se* discriminatory. *Doucette v. Morrison Cty., Minn.*, 763 F.3d 978, 986 (8th Cir. 2014) (quoting *Cox v. Dubuque Bank & Trust Co.*, 163 F.3d 492, 497 (8th Cir. 1998).

What's more, the Seventh Circuit has held that "isolated comments are not probative of discrimination unless they are 'contemporaneous with the discharge or causally related to the discharge decision-making process." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012) (quoting *Gleason v. Mesirow Fin. Inc.*, 118 F.3d 1134, 1140 (7th Cir. 1997). As noted, the temporal gap between the conversation (June 2017) and decision to fire Cook (January 2018) was roughly six months, and the PIP wasn't instituted until September 2017. The Seventh Circuit has held multiple times that such a gap in time between an allegedly discriminatory statement and an employee's discharge makes them non-contemporaneous, and thus, not enough to satisfy "but-for" causation. *See, e.g.*, *Markel v. Bd. Of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 910-911 (7th Cir. 2002) (comments made two months prior to termination not

-14-

contemporaneous); *Kennedy v. Schoenberg, Fisher, & Newman, Ltd.*, 140 F.3d 716, 724 (7th Cir. 1998) (comments made five months prior not contemporaneous). "More importantly, there is no [substantive] connection between [the comment] and the termination decision." *Fleishman*, 698 F.3d at 605.

Cook's argument only works if I assume that when in June 2017 the comment was made, it was part of a pretextual plan by ArcelorMittal to wait another three months, institute the PIP, and then wait another three months to fire Cook. But that's really nothing more than a speculative theory because Cook has not offered any evidence to support this beyond his own conjecture. And at summary judgment, a plaintiff needs evidence to survive.

Similarly, Cook's point about how he was able to do other aspects of his job well and that ArcelorMittal should have been OK with him delegating his programming work to other team members is unavailing. Cook's argument reads as him asking that ArcelorMittal should have provided him an accommodation, allowing him to focus on aspects of his job he was better at while delegating the aspects he wasn't good at to others. But there's no principle in age discrimination law that allows an employee to cherry pick those parts of the job he prefers to do and ignore others. An employee cannot simply avoid learning skills, new or otherwise, that are indisputably part of the job. And Cook conceded that staying abreast of technological changes and the latest software, including C#, was part of his job. [Cook Dep. Tr. 60:19-21.] Nor did he think his managers' expectations regarding C# were unreasonable, unjustified, or

discriminatory. [*Id.* at 68:22-25, 70:17-71:5.] It wasn't as if his managers were demanding

Cook master some skill completely unrelated to his job as a process engineer. They

didn't ask him to learn Farsi, cook the perfect soufflé, memorize the capital and flag of

every country, or run a marathon in under three hours. Their demands that he be

proficient in C# were undeniably an important part of his job. They plainly were not

erected as some unachievable barrier to set Cook up for failure.

      Nor does Cook's argument that he received a "3" on the majority of his

performance reviews while at the company help his cause. That argument ignores the

fact that in his final two years, he received a "2." Absent evidence of discrimination, the

only logical inference is that his performance declined, which is consistent with his

manager's testimony that Cook started receiving lower performance reviews when his

manager learned Cook was not doing his own coding and not proficient in C#. [*See*

Cook Dep. Tr. 75:8-22.] Likewise, Cook's argument that his promotion to senior process

engineer contradicts the fact that his performance was unsatisfactory fails to account for

the fact that the promotion occurred in 2012, years before his managers realized he was

not performing a key component of his job. Thus, Cook has failed to demonstrate he

was meeting ArcelorMittal's legitimate business expectations at the time he was fired.

      Cook has also failed to put forth evidence that similarly situated, but younger

employees were treated better than he was. Because Cook "was fired for poor

performance", he must point to some evidence that "younger, similar situated

[engineers] at [ArcelorMittal] who were not performing up to expectations" were not

fired like he was. *Widmar*, 772 F.3d at 467. "At the end of the day, the question is simply whether the same events would have transpired if plaintiff had been younger than 40 and everything else had been the same." *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 725 (7th Cir. 2018) (cleaned up and citations omitted). Cook fails to put forth evidence that this was the case.

Instead, in his interrogatory answers and at his deposition, Cook identified another ArcelorMittal employee named John Davis. According to Cook, (and seemingly undisputed by the company) Mr. Davis was an engineer who worked in another division at ArcelorMittal—he and Cook were not coworkers and did not report to the same manager. According to Cook, Mr. Davis committed a large "blunder" in his job, but instead of being fired, he was moved to another division within the company. [Cook Dep. Tr. 158:2-159:14.] But critically, Cook testified that Davis was roughly the same age as him, in other words, older than 40 and presumably in his mid-60s. [*Id.* 158:1-24.] Thus, even assuming he was treated more favorably than Cook, Mr. Davis was not outside of the same class of individuals over 40 who are protected by the ADEA. If anything, the fact the company treated another employee in the same age group as Cook well undercuts Cook's discrimination claim. Furthermore, ArcelorMittal points to uncontroverted evidence that it employed several other engineers in their fifties, sixties, and even seventies. [DE 35-1, Def.'s Answers to Interrog. at 5-7.] That's not dispositive, but it does undercut Cook's claims that he was discriminated against because of his age, as opposed to his inability to keep up to date on computer

-17-

programming. *See, e.g., Koski v. Standex Int'l Corp.*, 307 F.3d 672, 679 (7th Cir. 2002) (discussing potential relevance of evidence of a company's treatment of other older employees in age discrimination lawsuits). And there certainly does not appear to be any pattern of age discrimination at the company based on the information provided. *See, e.g., Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 424 (7th Cir. 2000) (discussing use of statistical information in age discrimination cases).

More on point, Cook next argues that after he was fired, a younger employee (oddly enough the one who attempted to tutor and assist Cook in learning C#) took over some of his job responsibilities. But that's largely irrelevant in these circumstances—that's the kind of evidence courts look to when an employee is laid off for economic reasons, not performance reasons. *Widmar*, 772 F.3d at 467 (explaining the different tests applicable depending on what the stated reason the employee's employment was ended). "[T]he mere fact that an older employee is replaced by a younger one does not permit an inference that the replacement was motivated by age discrimination." *Hastings v. SMC Corp. of Am.*, No. 1:12-CV-01269-JMS, 2014 WL 772677, at *11 (S.D. Ind. Feb. 25, 2014) (quoting *La Montagne v. Am. Convenience Prods., Inc.*, 750 F.2d 1405, 1413 (7th Cir. 1984)). Instead, what dictates the outcome here is Cook's failure to put forth evidence of another similarly situated employee outside of his protected class who was treated more favorably. *Skiba*, 884 F.3d at 723–24 ("Ultimately, plaintiff bears the burden of showing the individuals he identifies are similarly situated."). He does not identify any process engineer younger than 40 who did not know C# or lacked

-18-

programming knowledge but was treated better than him. (*i.e.*, not terminated).

"Similarly situated employees must be directly comparable to the plaintiff in all

material respects, but they need not be identical in every conceivable way." *Coleman v.*

*Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (citations and internal quotation marks

omitted). The result of that is that Cook fails to satisfy the fourth step of a *McDonnell*

*Douglas* prima facie case. As such, I need not go any further and summary judgment in

the company's favor is warranted. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 331–32

(7th Cir. 2002) ("Because Peele has failed to establish *prima facie* cases of sex and age

discrimination, we need not address her pretext argument.").

But let's suppose that Cook made out a prima facie case. The next question

would be whether ArcelorMittal's stated reasons for terminating him were a pretext. He

would not succeed on this point either. Cook "cannot create a factual dispute by stating

that his job responsibilities ought to have been something other than what the company

expected." *Widmar*, 772 F.3d at 464. Instead he must "must identify such weaknesses,

implausibilities, inconsistencies, or contradictions in the defendant's proffered reasons

that a reasonable person could find them unworthy of credence and hence infer that the

defendant did not act for the asserted non-discriminatory reasons." *Bates v. City of*

*Chicago*, 726 F.3d 951, 956 (7th Cir. 2013).

Cook may subjectively believe that he was doing well enough at his job and that

his team as a whole did all of the work required of it, so he individually should not be

fired for poor performance. But that's not the inquiry. Indeed, I might completely

disagree with the way ArcelorMittal treated Cook. But that's neither here nor there. This is because "it is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *See Widman*, 772 F.3d at 464 (citation omitted). There is no evidence that ArcelorMittal is lying about its reasons for firing Cook.

Indeed, the evidence is to the contrary. Prior to the alleged conversation regarding his retirement (in June 2017), Cook had been on notice that his performance was below satisfactory for roughly 18 months, all tied to his inability to program or code using the C# programming language. Then, in December 2017, nearly two years after his first unsatisfactory review, and three months after the PIP, Cook admitted that he was still not proficient in C#. Thus he, by his own admission, repeatedly failed to achieve the expectations that his employer had of him, and so no reasonable jury could find the company acted pretextually.

In sum, ArcelorMittal had a legitimate non-discriminatory reason for letting Cook go. He had documented and undisputed performance failures in his job, discussed at length above, and these problems provide a legitimate, non-discriminatory basis to terminate his employment. And Cook offers no additional evidence beyond the insufficient evidence already discussed, which would create a question of fact regarding ArcelorMittal's motivation for ending his employment. He thus cannot show that his age was the "but-for" cause of his termination.

-20-

**Conclusion**

For the foregoing reasons, Defendants ArcelorMittal USA LLC and ArcelorMittal Burns Harbor LLC's Motion for Summary Judgment [DE 26, 27] is GRANTED. The Clerk is DIRECTED to enter final judgment in favor of the defendants and close this case.

SO ORDERED on July 27, 2020.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT